Jean MILLER, Plaintiff-Appellant,

v.

Larry WILLIAMS, City of Berkeley, Defendants-Appellees.

No. 77–1240.

United States Court of Appeals, Ninth Circuit.

Jan. 29, 1979.

**318**

Carol Amyx, San Francisco, Cal., for plaintiff-appellant.

Michael S. Lawson, Deputy City Atty., Berkeley, Cal., Charles O. Triebel, Jr., Oakland, Cal., for defendants-appellees.

Before MERRILL and SNEED, Circuit Judges, and LINDBERG *, District Judge.

SNEED, Circuit Judge:

Appellant Miller appeals from a summary judgment in favor of the appellees, her employer and various officials thereof. Appellant's complaint alleged causes of action based on Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., particularly Section 704(a) of Title VII, 42 U.S.C. § 2000e–3(a), and 42 U.S.C. § 1983 and § 1985. Essentially, appellant alleged that her discharge from her position as a library assistant at the Berkeley Public Library was in retaliation for her activities both on and off the job, which were designed to advance the legitimate interests of women, and that her discharge denied her due process of law guaranteed by the Fourteenth Amendment because she was suspended and then later terminated from her employment without prior notice or opportunity to be heard. We affirm.

### I.

#### Facts

A condensed version of the undisputed facts is as follows. While employed as a library assistant at the Berkeley Public Library, appellant made public statements charging the City of Berkeley with sex and race discrimination and, with her employer's consent, initiated a project to make library materials about women more accessible to the public. Shortly after these events transpired, appellant came under the authority of a new supervisor who changed her work assignment in a manner that interfered with her project concerning materials about women. Appellant refused to accept the new assignment and appealed the supervisor's decision through channels to the City Librarian to no avail. Appellant continued to refuse the new assignment and to protest publicly the alleged discrimination by the City. These protests resulted in appellant's arrest on July 24, 1973 and July 27, 1973. Altogether between July 24, 1973 and October 6, 1973, appellant was arrested four times; for disrupting a City Council meeting, for chaining herself to a bookcase in the Library, for holding a "press conference" while refusing to leave the office of the Head Librarian after closing time, and for distributing leaflets in the Main Library lobby without permission.

---

* Hon. William J. Lindberg, Senior United States District Judge for the Western District of Washington, sitting by designation.

As one would expect, heated words passed between appellant and her supervisor. This occurred on July 30, 1973 and August 1, 1973. On August 2, 1973, appellant was informed by letter, which outlined the applicable appeal procedures, that she was suspended for five calendar days. Included with the suspension letter was another that informed appellant that the City Librarian wished to meet with the appellant and each of her supervisors on the first working day following the suspension. On August 10, 1973, the final day of appellant's suspension, the City Librarian received a letter from appellant's attorney stating that upon the attorney's advice appellant would not attend the requested meeting without an attorney present. The City Librarian, after consulting the City Attorney, informed appellant by letter on August 13, 1973, that such representation was not required. On both August 15 and 21, 1973, the City Librarian wrote to appellant requesting that she attend the meeting first requested on August 2, 1973. Appellant did not respond and on August 22, 1973, refused to accept a hand delivered letter from the same source requesting the same meeting.

Thereafter, events moved rather quickly. On the same day, August 22, 1973, the appellant was notified in writing that she was suspended for three calendar days for insubordination "pending a determination of the Board of Library Trustees for further disciplinary action." Two days later, August 24, 1973, the Trustees met and terminated appellant's employment. Appellant was not informed of the date, time, and place of this meeting but, nonetheless, did attend the meeting without participating. Appellant was informed orally of her appeal rights while at the Trustees' meeting. As a result of an arrest of August 27, 1973, appellant was in jail until released on September 5, 1973. On that date she received written notice of her appeal rights.

These appeal rights were accorded by the personnel rules then in effect for the Library and the City as a whole. Under these rules appellant was entitled to a full adversary hearing, with representation by counsel and cross-examination of witnesses *after*

her termination. To obtain this hearing, however, an aggrieved employee was required to file an answer in writing within three days from the receipt of the employer's "written statement of reasons" for the action being contested. Appellant received the Trustees' timely dispatched "statement of reasons" on September 5, 1973 when she emerged from jail. She did not file her answer in writing until September 12, 1973. Her answer was referred to the Affirmative Action Subcommittee of the City of Berkeley's Personnel Board for consideration. On October 10, 1973, the Subcommittee refused to hear the appeal on its merits. Appellant was notified of this meeting in a timely manner and participated in its discussions. In the course of her participation, appellant admitted that she was aware of the three-day rule and chose not to comply with it. The Subcommittee's decision not to hear the appeal was based on the appellant's failure to abide by the three-day rule. On October 26, 1973, this action by the Subcommittee was reported to the City Council. Thereafter, appellant turned to the Equal Employment Opportunities Commission for relief. In due course, that action led to this case.

## II.

### Claims Other Than Due Process

After reviewing the available documents and affidavits, the district court concluded that the appellant's arrests were not made to deprive her of her First Amendment rights but to preserve peace, order and tranquility. Moreover, he concluded that appellant's refusal to accept the new duties required by her new supervisor was unjustified and that her response to the reassignment was the cause of her suspension and dismissal. On the basis of these and other conclusions, the court granted summary judgment for the defendant.

The district court expressed uncertainty about the retaliation claim of the appellant, but refused to conclude that the reassignment occurred in retaliation for appellant's activities to promote non-discrimination.

The court afforded the appellant thirty days within which to amend her complaint "to specify the relief sought on the claim in retaliation." The appellant failed to amend and her cause was dismissed with prejudice.

■ Appellant contends that the summary judgment and dismissal of her complaint was erroneous because she had established a prima facie case of Title VII discrimination, which shifted to the appellees the burden of showing that the adverse action had a business justification. A prima facie case merely requires, the appellant asserts, that it be shown that she protested practices contrary to Title VII and "that she was then subjected to adverse action by her employer." We do not read *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) so broadly. To establish a prima facie case it requires:

> [a] showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

411 U.S. at 802, 93 S.Ct. at 1824. Recognizing that the *McDonnell Douglas* formulation was not fashioned with the type of case before us in mind, appellant would have us read *McDonnell Douglas* as if parts (ii) and (iii) did not exist. Those parts connect the employee's minority status described in part (i) with the fact that the position remained open, part (iv), in a way that plainly suggests discrimination. Appellant's formulation omits a showing that reasonably links her conduct with the employer's action. Such a showing might consist of explicitly articulated employer objections to an employee's protests voiced prior to the employer's adverse action. This would provide the link that would justify concluding that a prima facie case had been established. Other types of showings also might supply the necessary link, but appellant has failed to provide one in this case.

■ However, even should we be wrong in this we conclude that appellees have met the burden of establishing a legitimate nondiscriminatory reason for appellant's termination, and appellant has failed to demonstrate that this reason was a pretext concealing discriminatory or unconstitutional actions. Cf. *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802–05, 93 S.Ct. 1817. The district court so held and we agree. This conclusion is buttressed strongly by appellant's failure to amend her complaint when given the opportunity to do so.

We conclude, therefore, that insofar as appellant's complaint rested on grounds other than due process, it did not state a cause of action. We now turn to appellant's due process claim.

### III.

#### *The Due Process Claim*

■ In this appeal the appellant has devoted most of her attention to her due process claim, and her focus has been upon the failure of appellee's procedures to afford her a pretermination hearing. She contends that she had a property interest in her position as a library assistant and that her termination without a prior hearing was contrary to her due process rights under the Fourteenth Amendment.

In support of this contention appellant cites *Skelly v. State Personnel Board*, 15 Cal.3d 194, 124 Cal.Rptr. 14, 539 P.2d 774 (1975) which held that at a minimum "preremoval safeguards must include notice of the proposed action, the reasons therefor, a copy of the charges and materials upon which the action is based, and the right to respond, either orally or in writing, to the authority initially imposing discipline." 15 Cal.3d at 215, 124 Cal.Rptr. at 29, 539 P.2d at 788–89. Without question appellees' procedures in effect in August and September 1973 did not afford the appellant these minimum preremoval safeguards. Their applicability to the appellant's termination, however, presents a complex question.

It is true, as appellant points out, that in *Barber v. State Personnel Board*, 18 Cal.3d

395, 134 Cal.Rptr. 206, 556 P.2d 306 (1976), the California Supreme Court made *Skelly* retroactive "to all pending cases where the dismissals are not yet final." 18 Cal.3d at 402, 134 Cal.Rptr. at 210, 556 P.2d at 310. The difficulty is that by October 1975, the approximate time *Skelly* became effective, appellant's dismissal had long been final. Finality occurred no later than October 26, 1973, the date the Affirmative Action Subcommittee reported its decision not to hear appellant's appeal to the City Council. Thereafter appellant sought no writ of mandate (Cal.Code Civ.Proc. § 1094.5) as did the plaintiff in *Barber*; rather she turned from the State of California to the United States for relief. So far as California is concerned her dismissal was final.

Even were this not so and *Skelly*, accordingly, were applicable, we would be required, nonetheless, to decide whether our interpretation of the Fourteenth Amendment, as controlled by the Supreme Court of the United States in *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), conformed to that set forth in *Skelly* and, if not, whether, with respect to an employee of a municipality of the State of California, the minimal standards of *Skelly* should apply in any event. We might reach this latter position on the ground that a substantial failure to conform to the employer's own standards governing dismissal amounts to a violation of the employee's Fourteenth Amendment due process rights even when such standards are in excess of the Amendment's minimal requirements.

We need not, however, address these issues. Although this court has recognized that sometimes, but not always, a predismissal hearing may be constitutionally required, *compare Stretten v. Wadsworth Veterans Hospital*, 537 F.2d 361, 369 (9th Cir. 1976) *with Alsbury v. United States Postal Service*, 530 F.2d 852 (9th Cir.), *cert. denied*, 429 U.S. 828, 97 S.Ct. 85, 50 L.Ed.2d 91 (1976) and although we will assume without deciding that appellant had a "property interest" in her position, we conclude that under the unusual circumstances of this case the absence of a pretermination hearing did not enhance the risk of appel-

lant being subjected to a constitutionally improper deprivation of property. Appellant was accorded considerable due process rights of which she did not avail herself. The presence of a pretermination hearing in this case would not have altered one bit the risk of improper dismissal to which the appellant was exposed. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976) makes clear that in determining the specific requirements of due process there should be considered ". . . the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; . . ." Such consideration in this case leads unmistakably to the conclusion that appellant's due process claim is without merit.

AFFIRMED.