Filed 12/22/25  Riggs v. City of Los Angeles CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| BARBARA RIGGS, | B338162 |
| Plaintiff and Appellant, | Los Angeles County Super. Ct. No. 22STCP02841 |
| v. | |
| CITY OF LOS ANGELES et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mitchell L. Beckloff, Judge.  Affirmed.

Law Offices of Gregory G. Yacoubian and Gregory G. Yacoubian for Plaintiff and Appellant.

Hydee Feldstein Soto, City Attorney, Denise C. Mills, Chief Deputy City Attorney, Kathleen A. Kenealy, Chief Assistant City Attorney, Shaun Dabby Jacobs, Assistant City Attorney and Brian Cheng, Deputy City Attorney, for Defendants and Respondents.

———————————

Barbara Riggs was a sergeant with the Los Angeles Police Department at the onset of the COVID-19 pandemic. In 2021, the City of Los Angeles issued a mandatory COVID-19 vaccination policy requiring all City employees to vaccinate against the virus or request a medical or religious exemption. The City required employees who had requested an exemption to sign a notice acknowledging they were required to submit to twice-weekly COVID-19 testing with the City's vendor at the employees' expense ($65 per test) while their requests were pending. The City would reimburse those employees whose exemptions were granted.

Riggs refused to sign the notice. She objected to paying for the testing and testing under the City's vendor's terms—which required her to agree that her sample and information could be shared for industry research and telemedicine purposes. Riggs was removed from duty pending a Board of Rights hearing. After the Board found Riggs guilty of failing to comply with the City's COVID-19 vaccination and testing requirements—a condition of her employment—the Chief of Police discharged her. Riggs filed a petition for writ of mandate seeking back pay and reinstatement of her job. The trial court granted the petition in part, finding Riggs's *Skelly*[1] rights were violated and awarding her only back pay and benefits. On appeal, Riggs contends the City's requirement that she pay the City for her testing violated Labor Code section 2802, the notice thus was void under section 2804, and she was entitled to reinstatement. We affirm.

---

[1]     *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194, 215 (*Skelly*) (public employers must afford public employees due process before taking disciplinary action).

## BACKGROUND

### 1. *The City's vaccination requirements*

In August 2021, the City adopted Ordinance 187134 requiring that all present and future employees, by October 19, 2021, become vaccinated against COVID-19—or request an exemption for religious or medical reasons—"[t]o protect the City's workforce and the public that it serves." The ordinance stated, "Employees with medical conditions/restrictions or sincerely held religious beliefs, practices, or observances that prevent them from receiving a COVID-19 vaccine shall qualify for COVID-19 vaccine exemption, upon approval of documentation provided by the employee to the appointing authority or designee." Exempted employees were subject to weekly testing "at no cost during their work hours." The ordinance included an urgency clause declaring "this ordinance is required for the immediate protection of the public peace, health, and safety."

The City then negotiated with its labor organizations—including Riggs's union, the Los Angeles Police Protective League (LAPPL)—about the consequences of noncompliance with the ordinance. After reaching an impasse, the City issued its "Last, Best, and Final Offer" (LBFO) on October 14, 2021. The LBFO stated employees were noncompliant with the ordinance's vaccination mandate "if they have failed to become fully vaccinated **and** have not filed an intent to seek a medical or religious exemption by October 20, 2021." Such employees would be issued "a Notice of Mandatory COVID-19 Vaccination Policy Requirements" instructing them to submit proof of full vaccination by December 18, 2021. "Failure to sign or comply with the requirements of the Notice shall constitute failure

to meet a condition of employment and shall result in appropriate and immediate corrective action."

Employees who filed an intent to seek an exemption by October 20, 2021, however, would be considered "compliant with the Ordinance during the pendency of the exemption and accommodation process." The LBFO continued: "Accordingly, the City shall not issue the Notice and/or take employment action against an employee who is duly subject to the exemption and accommodation procedures. [¶] Employees who have reported a vaccination status of 'not vaccinated' and who file exemption paperwork and are awaiting the result of the City's evaluation process shall be subject to the same terms applicable to employees who are not fully vaccinated and who have received a Notice, including and limited to items 2, 3, 4, and 5." Items 2, 3, 4, and 5 required the employee to test for COVID-19 twice per week, through the City's vendor and on the employee's own time, and to reimburse the City $260 per pay period for four tests —at $65 each—through biweekly payroll deductions.

The LBFO then stated, "Each employee who is required to test while awaiting the determination by the City of their exemption request shall be required to sign a Notice and to comply with its terms . . . . Failure to sign and fulfill the conditions of the Notice shall constitute failure to meet a condition of employment and shall result in appropriate and immediate corrective action. [¶] If an employee who reported a vaccination status of 'not vaccinated' and who filed for an exemption is ultimately granted that exemption by the City, then the City shall reimburse the employee for the costs for testing."

4

On October 26, 2021, the City Council passed a "Resolution Implementing Consequences for Non-compliance with the . . . Ordinance . . ." providing for immediate implementation of the LBFO.  A stated basis of the resolution was the "significant financial burden" to the City if it "had to provide a weekly testing option for all unvaccinated City employees, or place all unvaccinated City employees on paid leave, while simultaneously paying overtime to cover staffing shortages resulting from their absence."

On October 28, 2021, the City's mayor issued a memorandum to all City department heads—including the Chief of Police—directing that they "[i]mmediately implement" the LBFO.  As relevant here, the mayor directed the department heads to "[i]ssue a *Notice of Mandatory COVID-19 Vaccination Policy Requirements – While Awaiting an Exemption/Appeal Determination* to each employee who is unvaccinated and <u>has filed</u> an exemption form."  (Footnote omitted.)  If the employee refused to sign the notice, the employee was to follow the testing regimen outlined in the LBFO and was to "test on paid time and at City expense, except that the City" would "issue an invoice for the cost of testing."  The mayor also directed that department heads "immediately begin the corrective action process outlined in the LBFO" for each employee who remained noncompliant as of December 18, 2021.  The memorandum stated:  "An employee that remains out of compliance shall be placed off duty without pay pending service of a Skelly package that includes a Notice of Proposed Separation.  Sworn employees shall be subject to applicable Board of Rights proceedings."

The City selected Bluestone Health to perform the twice-weekly COVID-19 testing.[2]  On October 29, 2021, the LAPPL filed a complaint in the Los Angeles Superior Court (case number 21STCV39987) against the City and others for declaratory and injunctive relief, and a petition for writ of mandate, regarding the ordinance and LBFO (the LAPPL action).  The LAPPL accused the City of withholding information and failing to negotiate in good faith in violation of Government Code section 3505 and violating Labor Code section 2802 by requiring employees to pay for testing.

## 2.    *Riggs did not comply with the testing requirement*

At the time of Rigg's termination, she had served 32 years with the Department and—among other positions—had acted as a field supervisor and an instructor.  Riggs filed for a religious exemption from the vaccination requirement.[3]  She also testified, at the Board of Rights hearing, she was afraid of possible adverse side effects from the vaccine.  Her son—for whom she was the primary caregiver—had special medical needs and depended on her.  Riggs testified, "I can't afford even the slightest side effect."

On November 16, 2021, Riggs met with her commanding officer Captain Peter Casey.  Casey served Riggs with the "Notice of Mandatory COVID-19 Vaccination Policy Requirements While Awaiting an Exemption/Appeal Determination."  Casey went over the process with Riggs and told her twice-weekly testing would

---

[2]    The City entered into a $3 million contract with Bluestone for testing, tracking, and telehealth consultation services from September 24, 2021 through September 23, 2022.

[3]    As of the Board of Rights hearing, January 18, 2022, Riggs's exemption request remained pending.

6

begin the following Monday and would be at her cost. Casey informed Riggs, " 'If you fail to do your twice-a-week testing, then you can be relieved of duty, assigned home, and possibly terminated. If your exemption is accepted and approved by the City, then you'll be refunded all the money that you paid for the testing process. And then you'll continue to still need to test once a week.' " Casey also told Riggs how to create a Bluestone account.

The notice stated, "Until the City has made a determination about whether to grant or deny my request for a medical or religious exemption under the Ordinance . . . , I agree to comply with the following required terms and conditions:" "I will undergo twice weekly COVID-19 testing" with the City's vendor; "I shall reimburse the City $260 per pay period for four tests . . . on a biweekly basis through my paycheck unless I decline authorization below"; and "I shall test on my own time." The notice also stated, "Employees who fail to sign this agreement will be invoiced for the costs of testing at a rate of $260 per pay period while awaiting an exemption or appeal determination." Riggs checked the box on the notice indicating she did not authorize the City to deduct the testing costs from her paycheck and understood she would be invoiced. Riggs refused to sign the notice.

On November 19, 2021, testing began. At 10:00 a.m. that day, Riggs sent a written form 15.07.00 "Employee's Report" (15.7) to Casey about "Bluestone's terms and agreement." The report stated: "I Sergeant II Barbara Riggs, do not consent to the sharing of my Covid-19 test results for industry research purposes or with any other vendor for any telemedicine purpose. In order to move forward with the testing through Bluestone,

I am forced to consent to the sharing of my results and information. I am requesting that I am able to test with the recruits until the [LAPPL] argues this matter in court on December 8, 2021[.] I do not want to be deemed insubordinate for failing to test with Bluestone."[4] Riggs did not create an account or submit to COVID-19 testing with Bluestone.

On December 9, 2021, the Department's Internal Affairs Division was informed that Riggs had "failed to comply with the COVID-19 Vaccination Policy Requirements." Sergeant Season Nunez was assigned to investigate. In a response to a written "interrogatory" Nunez sent, Casey stated Riggs had failed to take a COVID-19 test on November 24, 2021. She was ordered to take the test "or be subject to being assigned home." Casey stated Riggs said the test was "illegal, immoral, unethical, and

---

[4]    Earlier that morning, Riggs had received an email blast from the LAPPL explaining "the only way to sign up for Bluestone testing is to agree to their terms," which was an issue LAPPL had raised in its lawsuit. LAPPL explained, "[t]o avoid being charged with insubordination, you must agree to the Bluestone terms. If any member has an objection to these terms . . . and you want to put the department and Bluestone on notice, please do the following: [¶] 1) Fill out a 15.7 with the following language: 'I, Officer (Insert Name), do not agree or consent to the sharing of my COVID-19 test results for industry research purposes or with any other vendor for any telemedicine purpose. In order to move forward with the testing through Bluestone, I was forced against my will to "click" the box agreeing to share my results. I did so under duress to avoid being found insubordinate or in violation of the City's COVID-19 vaccination ordinance, which would lead to my termination from the department.['] [¶] 2) Give a copy of the filled out 15.7 to your Captain."

experimental test tubing." On December 9, 2021—Riggs's next working day—Riggs returned to work and failed to test. Casey told Riggs to clean out her desk and locker and to go home.

On December 16, 2021, Casey signed a complaint review report against Riggs referring her for disciplinary consideration. The preliminary investigative narrative stated:

> "The Department Employee was served with the Notice of Mandatory COVID-19 Vaccination Policy Requirements by their Commanding Officer. [¶] The Department Employee was advised that failure to sign, or disagreement to any part of the notice, would cause them to be placed off-duty pending pre-separation due process procedures. The Department Employee was given 48 hours to respond. The Department Employee refused to sign the notice as required, and/or comply with the notice as required."

Casey gave Riggs a complaint adjudication form, notifying her she had until December 21, 2021 to respond (*Skelly* response) and that her response would "be reviewed by the Chief of Police for evaluation prior to adjudication of this matter."[5] Riggs signed the form on December 16, 2021, and initialed boxes indicating she had received a copy of the investigation materials, had been informed of her right to representation, and intended to submit a response. Riggs did not submit a response on December 21.

---

[5] In Casey's experience, officers normally had 30 days to submit a *Skelly* response.

9

Also on December 16, defendant Chief of Police Michel Moore signed a "complaint and relief from duty, proposed removal, suspension, or demotion" against Riggs. The Department personally served Riggs with the complaint and relief from duty notice on December 21, 2021. The complaint charged Riggs with failing "to comply with the requirements of the Notice of Mandatory COVID-19 Vaccination Policy Requirements, a condition of employment." The complaint directed Riggs "to a Board of Rights with the proposed penalty of removal" from her employment with the Department and stated the Chief temporarily had relieved her from duty effective December 22, 2021. The form advised Riggs she would "not suffer a loss of compensation for thirty calendar days after the date on which [she was] served with the charge(s)."

3.      ***The Board of Rights hearing***

On January 18, 2022, the Board of Rights began a nonconsecutive, five-day hearing on the single charge against Riggs. On March 10, 2022, the Board rendered its decision. The Board found it undisputed that Riggs "failed to comply with the requirement for mandatory testing set forth in the [LBFO]" when she refused to test with Bluestone. The Board considered Riggs's arguments, including—among others—her objection to the mandated testing procedure with Bluestone because she did not want to consent to Bluestone's sharing of her test results or sample with others; and her contention that the requirement that she reimburse the City for the cost of testing—when vaccinated employees could test for free—violated Labor Code section 2802, rendering the testing requirement an illegal condition of

10

employment. Riggs also argued the notice was void under Labor Code section 2804.[6]

The Board was not persuaded. Although the Board agreed "it's troubling to require some but not all employees to pay for testing, and the requirement ultimately may be a Labor Code violation," it found Riggs's section 2802 claim was "premature." The Board noted employees "were allowed to opt for invoicing, which option [Riggs] selected, and a Labor Code violation could not occur, if at all, until the Department insisted on collecting payment without reimbursement."

The Board acknowledged—and had compassion for— Riggs's "strength of conviction" and applauded her 32 years of service. But it found "her passion and . . . service do not translate to a legally defensible position." The Board explained the matter before it "boils down to the simple proposition that [Riggs] determined not to vaccinate; she was offered the alternative to test; she refused to test. Passion notwithstanding, Sergeant Riggs's refusal to obey a directive was outside the boundaries

---

[6] All undesignated statutory references are to the Labor Code. Section 2802, subdivision (a) states: "An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer, even though unlawful, unless the employee, at the time of obeying the directions, believed them to be unlawful." Section 2804 in turn states: "Any contract or agreement . . . made by any employee to waive the benefits of this article or any part thereof, is null and void, and this article shall not deprive any employee or his personal representative of any right or remedy to which he is entitled under the laws of this State."

of acceptable conduct." Accordingly, the Board unanimously found Riggs guilty of the single count levied against her.

The Board moved on to the penalty phase. The Board noted Riggs had many commendations in her 32 years of service and no sustained complaints. The Board also noted Riggs had been commended on her " 'professionalism' " and " 'dedication to tactics,' " the high morale of her division due to her leadership, her teamwork, and her dedication to recruits. In short, Riggs had a "stellar commitment to the Department and to the community that she serves and to the recruits that she was training." The Board unanimously decided "to hold the penalty phase in abeyance and recommend to the Department that they consider allowing Sergeant Riggs to enter into a contract whereby she would return to duty and agree, during the period of the contract, to abide by the policies and procedures of the Department relating to the mandatory COVID testing as she awaits the determination of her religious exemption from the vaccine." The penalty phase was continued to May 10.

The Department rejected the Board's recommendation. After further deliberation, the Board unanimously recommended the Chief of Police terminate Riggs's employment because she had failed to comply with a condition of employment. On May 18, 2022, the Chief of Police executed the order to terminate Riggs's employment "with total loss of pay" effective January 21, 2022.

### 4. *Petition for Writ of Mandate*

On July 29, 2022, Riggs filed a petition for writ of mandate against the City of Los Angeles and Michel Moore seeking to reverse her termination and for reinstatement with back pay.

Meanwhile, in the LAPPL action, the court (Judge Rupert Byrdsong)—on July 13, 2022—granted LAPPL's petition for

writ of mandate, finding section 2802 applied "to a charter city concerning the costs of testing for COVID-19 made mandatory by the City for its unvaccinated employees." The court's statement of decision ordered the issuance of a writ of mandate enjoining the City from requiring unvaccinated LAPPL-represented employees to incur the cost of City-required COVID-19 testing and compelling the City to indemnify and to reimburse any of those employees who had paid such costs. The court filed its statement of decision on September 30, 2022.

In February 2023, the City passed a resolution entitled "Resolution Discontinuing COVID-19 Surveillance Testing Requirements Implemented Pursuant to Ordinance No. 187134." The resolution "immediately" ceased the LBFO's mandatory testing requirement for unvaccinated City employees—with the option to reassess and reinstate testing at a later time; required all City employees who had incurred testing costs to be reimbursed; and stated that no City employee was to be charged for any required testing. The resolution's recitals referred to Judge Byrdsong's decision in the LAPPL action as one reason— among several others—for the City's change to its testing policy.[7]

Riggs relied on the statement of decision to argue section 2802 barred the City from requiring its employees to pay for City-mandated testing and on the resolution to argue testing no longer was a condition of employment. Riggs asked the court to take judicial notice of Judge Byrdsong's statement of decision and the City's February 2023 resolution.

---

[7] For example, the resolution also noted guidance on "the use of surveillance testing of unvaccinated employees as a strategy for preventing the spread of COVID-19 ha[d] changed significantly."

13

On August 16, 2023, the court heard Riggs's petition. The court asked City counsel if it were true that Riggs would not have been disciplined today. Counsel explained there no longer was a need for testing because circumstances had changed. The court continued the hearing to October and ordered the parties to submit briefing on the relationship between the ordinance and the resolution that suspended the ordinance's testing requirements and whether the ordinance's testing, vaccination, and reporting requirements no longer were being enforced or conditions of employment.

Defendants responded that the ordinance still was in effect but weekly surveillance testing had been suspended. Riggs responded that the October 2021 resolution—requiring employees to pay for their testing—was at issue, not the ordinance. After the October 18 hearing, the court permitted the parties to submit additional briefing "to address . . . section 2802 in the context of the City's COVID-19 testing requirement and [Riggs's] discharge." The court noted Riggs's reliance "on a statement of decision from a different (and now dismissed) action was insufficient to meet her burden on the issue." The court also was "not entirely clear how, if at all, an alleged violation of . . . section 2802 would serve as a defense to [Riggs's] charge." The court continued the hearing to December 20.

In their supplemental briefing, defendants cited the then-recently published decision of *Krug v. Board of Trustees of California State University* (2023) 94 Cal.App.5th 1158 (*Krug I*), vacated and cause remanded for reconsideration in light of *Stone v. Alameda Health System* (2024) 16 Cal.5th 1040 (*Stone*). Defendants asserted the *Krug I* court held "section 2802 cannot be applied because doing so would be 'an infringement upon

14

sovereign governmental powers.' " Riggs argued *Krug I* merely held section 2802 did not apply there—where an employee sought reimbursement from California State University— " 'because Krug's claims f[e]ll squarely within the ambit of CSU's vested authority to set the terms for employee expense reimbursement.' " (Quoting *Krug I*.) Riggs argued *In re Acknowledgment Cases* (2015) 239 Cal.App.4th 1498, 1502 already had applied section 2802 to the City. She argued the notice did not include a severability clause and the agreement for employees to bear the cost of testing therefore was void under section 2804.

On December 20, 2023, after hearing additional argument, the court took the matter under submission. The court issued its written decision on January 18, 2024.

The court denied Riggs's request for judicial notice of Judge Byrdsong's statement of decision in the LAPPL action. Taking judicial notice of the court file, the court explained the case had been dismissed after the parties entered a settlement, and there was no evidence the court ever had issued the contemplated writ of mandate. In any event, the written decision was not binding authority. (Citing *Santa Ana Hospital Center v. Belshé* (1997) 56 Cal.App.4th 819, 83[1] for its statement that " 'a written trial court ruling has no precedential value.' ") Moreover, at the time Judge Byrdsong issued his statement of decision, *Krug I* had not been decided. And, although the court took judicial notice of the resolution discontinuing surveillance testing, the court found the resolution had not superseded the ordinance. (See *City of Sausalito v. County of Marin* (1970) 12 Cal.App.3d 550, 565–566, cited by the trial court for the statement that a resolution usually is not equivalent to an

15

ordinance and cannot be deemed one if " 'adopted without the "formality" required of an ordinance.' "].)

The trial court granted Riggs's petition in part, finding defendants violated her due process rights under *Skelly* by failing to give her sufficient time to present her response to the complaint. The court awarded Riggs back pay and benefits from January 21, 2022 to May 18, 2022. The court found defendants "did not commit a manifest abuse of discretion when they discharged [Riggs] as a penalty." The court also determined section 2802 did not apply because Riggs had not incurred any expenditures, and the City had not sought recovery of any costs; and application of section 2802 to the City would infringe on its "sovereign government powers as to expenditures, budgeting and emergency preparedness," as in *Krug I*.

Accordingly, the court found Riggs's contention that the City's condition of employment was illegal and unenforceable under section 2802 "lack[ed] merit." The court explained Riggs's section 2802 claim did "not excuse [her] failure to participate in COVID-19 testing as required by the LBFO and the Notice." The court entered judgment on February 22, 2024. Riggs timely appealed.

## DISCUSSION

### 1. *Standard of review*

"In a proceeding for administrative mandate, the judicial inquiry extends to whether the public agency 'has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion.' (Code Civ. Proc., § 1094.5, subd. (b).) An abuse of discretion is established if the public agency 'has not proceeded in the manner required by law, the order or decision is not supported by the

16

findings, or the findings are not supported by the evidence.' (*Ibid*.) ' "[R]arely, if ever, will a board determination be disturbed unless the petitioner is able to show a jurisdictional excess, a serious error of law, or an abuse of discretion on the facts." ' " (*Bedard v. City of Los Angeles* (2024) 106 Cal.App.5th 442, 453–454 (*Bedard*), rehg. den. Nov. 21, 2024, review den. Jan. 15, 2025, cert. den. Oct. 6, 2025.)

"The trial court reviews the administrative decision de novo but affords the administrative findings 'a strong presumption of correctness.' [Citation.] '[T]he party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence.' " (*Bedard, supra*, 106 Cal.App.5th at p. 454.)

" ' " 'When an appeal is taken from the trial court's determination, it is given the same effect as any other judgment after trial rendered by the court: the only question is whether the *trial court's* (not the administrative agency's) findings are supported by substantial evidence. [Citation.] Conflicts in the evidence must be resolved in favor of the judgment and where two or more inferences can be reasonably drawn from the facts, the reviewing court must accept the inferences deduced by the trial court.' [Citation.]['] . . . [¶] " 'Evidence is substantial if any reasonable trier of fact could have considered it reasonable, credible and of solid value.' [Citation.] Additionally, a reviewing court 'may look to the findings in [the administrative agency's] decision for guidance in determining whether the trial court's judgment is supported by substantial evidence.' [Citation.]" ' [Citations.] 'However, we are not bound by any legal

17

interpretations made by the administrative agency or the trial court; rather, we make an independent review of any questions of law.' " (*Bedard, supra*, 106 Cal.App.5th at p. 454.)

"We also 'review de novo whether the agency's imposition of a particular penalty on the petitioner constituted an abuse of discretion by the agency. [Citations.] But we will not disturb the agency's choice of penalty absent " 'an arbitrary, capricious or patently abusive exercise of discretion' " by the administrative agency.' " (*Bedard, supra*, 106 Cal.App.5th at p. 454.)

## 2. *Section 2802 does not apply nor does it render the notice void*

Riggs contends defendants violated sections 2802 and 2804 by conditioning her continued employment on her agreement to submit to COVID-19 testing through Bluestone and to pay for that testing.[8]

In concluding section 2802 did not apply, the trial court followed *Krug I* and found the application of section 2802 to the City's COVID-19 testing requirements would infringe on its "sovereign government powers as to expenditures, budgeting and emergency preparedness." Our Supreme Court vacated and remanded *Krug I* to Division One of this district for further

---

[8] Riggs also argues the notice at issue violated section 450 because Bluestone was a City contractor. That section provides: "No employer, or agent or officer thereof, or other person, may compel or coerce any employee . . . to patronize his or her employer, or any other person, in the purchase of any thing of value." (§ 450, subd. (a).) As Riggs notes, she did not raise section 450 in the trial court. She has forfeited the issue. (See *Rand v. Board of Psychology* (2012) 206 Cal.App.4th 565, 587 (*Rand*) [contention not raised in administrative proceeding or in trial court is forfeited].)

18

consideration in light of its decision in *Stone*, *supra*, 16 Cal.5th 1040.  (See *Krug v. Board of Trustees of California State University* (2025) 110 Cal.App.5th 234, 238, review den. June 11, 2025 (*Krug II*).)  In *Stone*, our high court held that, " '[w]hile the "sovereign powers" principle can help resolve an unclear legislative intent, it cannot override positive indicia of a contrary legislative intent.' "  (*Stone*, at p. 1054.)  The *Stone* court found there were " 'positive indicia' of a legislative intent to exclude public employers" from Labor Code wage and hour provisions, rendering the "sovereign powers" principle inapplicable.  (*Id.* at pp. 1049, 1054.)

On remand, while this appeal was pending, Division One followed "*Stone*'s analytical framework" to determine if the Legislature "intended to exclude public entity employers from" section 2802's "employment expense reimbursement obligations." (*Krug II, supra*, 110 Cal.App.5th at pp. 237, 241.)  The *Krug II* court considered the language, structure, and history of section 2802—including that neighboring Labor Code provisions within the same article "expressly impose[d] obligations on both private and public employers" by modifying "employer" with the phrase " 'whether private or public.' "  (*Krug II*, at pp. 241, 243 [giving §§ 2800.2, 2806, 2807, 2808, and 2809 as examples].)  The court concluded the lack of an express reference to public employers in section 2802 indicated the Legislature did not intend "to expose public employers to employer reimbursement liability."  (*Krug II*, at pp. 243–244; see also *Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1190 ["The specific enumeration of . . . governmental entities in one context, but not in the other, weighs heavily against a conclusion that the Legislature intended to include" public entities within the silent statute.]; *Stone, supra*,

16 Cal.5th at p. 1055 [" 'the Legislature is capable of bringing government entities within the scope of specific legislation when it intends to do so' "].)  The parties addressed *Krug II* in their briefing.

Riggs attempts to distinguish *Krug II*, arguing that case involved a professor who sought reimbursement from CSU for equipment he had bought of his own accord to teach classes remotely during the pandemic, while this case involved the City requiring the employee to pay the City back for "job-related expenses" the City had incurred through its contract with Bluestone.  Riggs contends the *Krug II* decision thus "dealt only with whether a public employee has a right under section 2802 to *reimbursement* from a public entity," quoting the *Krug II* court's conclusion that " 'the statutory structure and legislative history [of section 2802] provide positive indicia of legislative intent to exclude public employers from the provision[']s *reimbursement obligations.*' "  (Quoting *Krug II, supra*, 110 Cal.App.5th at p. 258 and adding italics.)  Yet, Riggs does not adequately articulate why this factual difference affects the *Krug II* court's underlying reasoning—based on analysis of the statutory framework and legislative history, and with which we agree—that the Legislature intended to exclude public employers from section 2802, subdivision (a).

Riggs also argues that, while section 2802 "simply refers to 'an employee' and 'his or her employer,' " section 2804 refers to any " 'contract or agreement' " made by " 'any employee,' " signaling "significant legislative intent to be more inclusive as to whom is to be protected."  Riggs argues the Legislature could have adopted the same language as in section 2802— " 'an employee' "—but it did not, and the language it did adopt

20

—" 'any employee' "—"would most certainly have to include both public and private 'employees.' " Riggs goes on to note Labor Code section 3351 defines " 'employee' to expressly include '[a]ll elected and appointed paid public officers,' such as a police officer." (Quoting § 3351, subd. (b).)

We are not persuaded. First, section 2804 applies only "to the benefits of this article"—article 2. Thus, whether section 2804 applies to public and private employees alike is irrelevant as it does not expand the benefits section 2802 provides.[9] Second, section 3351 falls under Division 4 of the Labor Code, which governs workers' compensation and insurance—a different subject matter from that at issue here. (Division 3 of the Labor Code, where sections 2802 and 2804 are found, is titled, "Employment Relations." ) Significantly, section 3300 specifically defines " 'employer' "—as used in Division 4—to include "[e]ach county, city, district, and all public and quasi public corporations and public agencies therein." (§ 3300, subd. (b).) Accordingly, the definitions in that division support—rather than detract from —the reasoning in *Krug II* underlying its holding that "employer" in section 2802 does not include a public entity. (See *Krug II, supra*, 110 Cal.App.5th at p. 245 ["That the same legislative session which applied the workers' compensation scheme to

___

[9]    As we discussed, the court in *Krug II* noted other sections —in contrast to section 2802—within the same article "expressly impose obligations on both private and public employers." (*Krug II, supra*, 110 Cal.App.5th at p. 243.) Thus, it makes sense that section 2804 would apply to "any employee" to the extent a specific statute within article 2 conferred benefits on both private and public employees through their expressly-stated application to both private and public employers.

21

public employers declined to do so in section 2802 strongly suggests the Legislature intended the latter provision to apply only to private entities."]; see also *id.* at pp. 244–245 [noting other Labor Code provisions "governing employer obligations also expressly state whether they apply to public employers," suggesting that "when the Legislature intended an obligation to apply to a public employer, it did so expressly"].) We adopt *Krug II's* reasoning here.[10]

In any event, substantial evidence supports the court's finding that, even if section 2802 applied, Riggs failed to demonstrate the City violated the statute. As the trial court explained, section 2802 "is an indemnification statute that applies to expenditures actually 'incurred' by an employee." It is undisputed Riggs never incurred any out-of-pocket costs

---

[10] Riggs alternatively argues *Krug II* "should not be given retroactive effect in [her] case." She contends that under *Brinkerhoff-Faris Trust & Savings Co. v. Hill* (1930) 281 U.S. 673, "due process of law is denied when a state court's decision, based on a new interpretation of a statute, deprives a party of a remedy that was previously available under state law." That is not the case here. The *Krug I* court already had found section 2802 did not apply to public entities, albeit through application of the sovereign powers principle. (But in doing so, the *Krug I* court also found there were no "positive indicia of a legislative intent to exempt [government] agencies from the statute." (*Krug I.*)) Moreover, in *Hill*, the plaintiff effectively was "deprive[d] . . . of property" without having been afforded "at any time an opportunity to be heard in its defense" of an alleged illegal tax. (*Hill*, at pp. 677–680.) Riggs, in contrast, had a full hearing on the merits of her claims. She also had the opportunity to address—and did address—*Krug I* in her opening brief and *Krug II* in her reply brief.

for testing. Moreover, the notice did not require employees to reimburse the City for testing through paycheck deductions. Rather, employees—as Riggs did here—could opt out of payroll deductions and receive an invoice from the City instead. Indeed, the evidence presented to the Board established no employee who had applied for an exemption as of the hearing date had been required to reimburse the City for testing costs.

We also agree with the trial court that Riggs's claim that the City's condition of employment was illegal and unenforceable under section 2802 did not excuse her "failure to participate in COVID-19 testing as required by the LBFO and the Notice." As we discussed, section 2804 would apply—if at all—only to a waiver of the benefits available under section 2802—that is, indemnification. As the trial court explained, even if the City's requirement that employees reimburse the City for testing costs were deemed void under section 2804, Riggs cited no authority demonstrating section 2804 "somehow nullified" the City's condition of employment that employees undergo COVID-19 testing while awaiting an exemption determination. It is undisputed Riggs did not test as required.

Riggs argues *In re Acknowledgment Cases*, *supra*, 239 Cal.App.4th 1498, establishes sections 2802 and 2804 applied here. That case involved an Administrative Code provision requiring LAPD officers to reimburse the City for a prorated cost of their mandatory training if they voluntarily left to work for another law enforcement agency after serving fewer than 60 months with the LAPD. (*Id*. at pp. 1501–1502.) The City required applicants to sign an agreement—called " 'the acknowledgment' "—to that effect. (*Id*. at p. 1502.) The City successfully sued several former officers for breaching

23

the acknowledgment.  (*Id.*)  On appeal, the officers argued the acknowledgment was unenforceable because the reimbursement requirement violated section 2802.  The reviewing court held the training reimbursement requirement violated section 2802 with respect to employer-mandated training, which would be an expense of discharging the duties of employment under the statute.  (*Id.* at pp. 1502, 1507.)  As a result, the acknowledgment was void under section 2804.  (*Id.* at pp. 1502, 1507–1508.)  Riggs argues the requirement that she reimburse the City for the cost of the mandatory COVID-19 testing—an expense required to discharge her duties of employment—similarly violated section 2802 rendering the notice void under section 2804.

As the court in *Krug II* explained, the issue in *In re Acknowledgment Cases* was "whether the costs of employee training qualified as 'necessary expenditures or losses incurred by the employee' in direct consequence of the discharge of the employee's duties."[11]  (*Krug II, supra*, 110 Cal.App.5th at p. 256.)

---

[11]      In *In re Acknowledgment Cases*, the court found "basic POST certification training"—"a statutory prerequisite to exercising the powers of a peace officer in California"—was "not an expense of discharging the duties of employment, within the meaning of Labor Code section 2802, but is rather an expense which is to be borne by the individual officer."  (*In re Acknowledgment Cases, supra*, 239 Cal.App.4th at pp. 1506–1507.)  The City, however, mandated training "in excess of that required for basic POST certification."  (*Id.* at p. 1507.)  The court found section 2802 precluded the City from requiring recruits to reimburse the City "for the cost of the portion of the training which is in excess of that required for basic POST certification."  (*Ibid.*)  The court thus found the code provision and acknowledgment were "void to the extent that they require[d] reimbursement for the cost of training other than basic

24

The parties did not raise—nor did the court discuss—"whether section 2802 applies to public as opposed to only private employers." (*Ibid.*) "Cases are not authority for propositions not considered." (*Ibid.*, citing *B.B. v. County of Los Angeles* (2020) 10 Cal.5th 1, 11.)

But even if section 2802 applied to public employers who seek reimbursement from employees—and the testing costs at issue here were a necessary cost incurred in the discharge of Riggs's duties, an issue we need not decide—as discussed, the statute is not implicated. In contrast to the officers in *In re Acknowledgment Cases*, the City never attempted to recover— or invoice—any testing costs from Riggs. As Riggs never had to pay anything for the testing, the City did not fail to reimburse or indemnify her under section 2802. Critically, Riggs's termination was a direct result of her failure to undergo mandatory testing, not simply her failure to sign the notice.[12] (Cf. *Bedard, supra*,

---

POST certification training." (*Id.* at pp. 1507–1508.) The court did not consider whether the City had "transformed basic POST certification training into employer-mandated training" by requiring recruits to attend its academy for all training, because the case "was tried on an all-or-nothing basis—either the acknowledgment was enforceable or it was not." (*Id.* at p. 1508.) The court thus concluded the acknowledgment was "entirely void." (*Ibid.*)

[12] Riggs contends she never refused to test, citing her request "to test with the recruits" due to Bluestone's requirement that she agree her results could be shared. Yet, the LAPPL advised Riggs to register for an account with Bluestone but to object to the sharing of her information in a 15.7. Riggs objected but did not sign up for an account to test through Bluestone despite LAPPL having advised her she would be "charged with

106 Cal.App.5th at pp. 454–456 [concluding substantial evidence supported finding that sergeant's employment was terminated because "she refused to comply with the vaccine mandate set forth in the ordinance," not "just for failing to sign the Notice"].) Indeed, the notice itself contemplated there would be some employees who would not sign it. The notice specifically stated such employees would be invoiced for the costs of testing while they awaited their exemption determination. In any event, had Riggs tested, and her religious exemption been approved, she would have received a refund for any amount she had paid the City for testing.

As defendants note, this division affirmed the discharge of another sergeant with the Department—Bedard—who refused to get vaccinated and to sign the notice of mandatory COVID-19 vaccination policy requirements. (*Bedard, supra*, 106 Cal.App.5th at pp. 448, 454–457.) It was unnecessary for us to decide whether the condition requiring Bedard to pay for testing violated section 2802, in part because there was substantial evidence that Bedard had "violated the ordinance's vaccination mandate. Her refusal to vaccinate without an exemption, standing alone, supported the City's disciplinary action" of termination. (*Bedard*, at p. 457.) Unlike Bedard (*id*. at p. 456), Riggs timely filed a religious exemption to the vaccination requirement and was awaiting its determination. Their situations thus were different. Nevertheless, as in *Bedard*, substantial evidence supports the trial court's finding that Riggs violated the City's COVID-19 testing requirement—a condition

_____

insubordination" if she did not. Riggs does not explain how her agreement to test with the recruits complied with the City's mandatory testing requirement.

26

of her employment—and any claim that sections 2802 and 2804 rendered the notice invalid did not excuse her from participating in the required COVID-19 testing.

For the first time in her reply brief, Riggs argues the City's resolution also violated section 6401. That provision states: "Every employer shall furnish and use safety devices and safeguards, and shall adopt and use practices, means, methods, operations, and processes which are reasonably adequate to render such employment and place of employment safe and healthful. Every employer shall do every other thing reasonably necessary to protect the life, safety, and health of employees." (§ 6401.) Riggs argues that, because the virus testing was a safety measure, the City violated section 6401 by trying to "shift the cost of the safety measure of virus testing" to employees. (Citing *Lehmann v. Los Angeles City Board of Education* (1957) 154 Cal.App.2d 256, 260–261 for its holding that section 6401 applies to public agencies.)

Riggs never raised this argument in the Board hearing, in the trial court, or in her opening brief. We therefore do not consider it. (See *Doe v. University of Southern California* (2018) 28 Cal.App.5th 26, 41 [failure to present argument in administrative appeal or before administrative body forfeits the issue or defense]; see also *Rand, supra*, 206 Cal.App.4th at p. 587; *Bedard, supra*, 106 Cal.App.5th at p. 455, citing *Doe* and *Rand* [argument not made to Board or before the trial court was forfeited].) In any event, again, it was Riggs's failure to comply with mandatory testing that led to her termination.

### 3.     *The City did not abuse its discretion in discharging Riggs*

" '[In] a mandamus proceeding to review an administrative order, the determination of the penalty by the administrative body will not be disturbed unless there has been an abuse of its discretion.' " (*Skelly, supra*, 15 Cal.3d at p. 217; *County of Los Angeles v. Civil Service Com. of County of Los Angeles* (2019) 40 Cal.App.5th 871, 877.)  In considering whether an abuse of discretion occurred, "the overriding consideration . . . is the extent to which the employee's conduct resulted in, or if repeated is likely to result in, '[harm] to the public service.'  [Citations.] Other relevant factors include the circumstances surrounding the misconduct and the likelihood of its recurrence." (*Skelly*, at p. 218.)  If reasonable minds may differ as to the propriety of the penalty, no abuse of discretion has occurred.  (*County of Los Angeles,* at p. 877 ["Only in an exceptional case will an abuse of discretion be shown because reasonable minds cannot differ on the appropriate penalty."].)

The ordinance and LBFO stated regular COVID-19 testing was a condition of employment for employees with an exemption, and for those seeking an exemption, respectively.  The uncontroverted evidence established a "condition of City employment" meant that, fulfilling the stated requirement was necessary "in order to be able to be employed by the City . . . from this date going forward."  As Riggs notes, the ordinance and LBFO were inconsistent as to whether signing the notice was a condition of employment.  Nunez also testified Riggs was not required to sign the notice, as she had submitted an exemption request.  We need not resolve that issue, as *complying with the terms* of the notice undisputedly was a condition of

28

City employment. Moreover, the complaint charged Riggs with having "failed to comply with the requirements of the Notice of Mandatory COVID-19 Vaccination Policy Requirements, a condition of employment."

The evidence is undisputed that Riggs did not submit to the required COVID-19 testing. The Board found "Riggs's refusal to obey a directive was outside the boundaries of acceptable conduct." Accordingly, we agree with the trial court that the Board and Chief of Police reasonably could determine that discharge was the appropriate penalty for Riggs's failure to meet a condition of employment. At a minimum, reasonable minds certainly could differ about the appropriate penalty.

We also agree with the trial court that Riggs's failure to fulfill a condition of employment made it unnecessary for the Board to consider the Department's disciplinary guidelines or the mitigating circumstances Riggs presented—although the Board acknowledged Riggs's unblemished service and leadership. Moreover, as the trial court noted, under the Department's disciplinary guidelines, the recommended penalty for a first offense of insubordination or violation of any City policy, rule, or procedure ranged from a reprimand to an order to face a Board of Rights with a recommendation for removal—as was the case here. Accordingly, discharge did not fall outside the Department's guidelines.

Finally, as the ordinance and resolution were passed due to the public health emergency caused by the COVID-19 pandemic, "the imminent threat" it posed "to public health and safety and workplace safety," as well as its effect on City employees and operations, we cannot conclude the Board acted unreasonably in selecting the upper range of the discipline recommended under

29

the guidelines. Riggs—who was a sergeant and a supervisor— was not vaccinated and refused to test with the City's vendor while she awaited a determination on her exemption, as required. Reasonably, she thus placed her colleagues and the public with whom she interacted while on duty at risk. We agree with the trial court that, under these circumstances, the Board reasonably could conclude Riggs's refusal to comply with the City's mandatory COVID-19 policies harmed the public service and risked additional harm to the public service. Accordingly, we find no abuse of discretion on defendants' or the trial court's part.

**4.     *The* Skelly *violation did not require reinstatement***

The trial court found the City violated Riggs's due process rights under *Skelly* when it failed to give her a reasonable period of time to respond to the Department's complaint against her —i.e., to submit a *Skelly* response—before the Chief of Police recommended Riggs's discharge. Rejecting Riggs's contention that reinstatement was the proper remedy for the *Skelly* violation, the court awarded her back pay and benefits from January 21, 2022 to May 18, 2022—when the Chief of Police signed the final order executing the Board's recommendation that Riggs "be removed from her position as sergeant, with total loss of pay, effective 01/21/2022."

In *Barber v. State Personnel Board* (1976) 18 Cal.3d 395, 402 (*Barber*), our high court held the remedy for a *Skelly* violation "is to award back pay for the period of wrongful discipline." (See also *Economy v. Sutter East Bay Hospitals* (2019) 31 Cal.App.5th 1147, 1162 ["*Barber* makes clear that whether the employer had a legitimate basis to terminate the employee's employment and whether the employee is entitled to reinstatement are questions entirely distinct from whether

30

the employee is entitled to backpay for the period during which the discipline was invalid."].)

Riggs contends that, because she was fired for refusing to sign the notice as a condition of her employment, and the notice was unlawful, she is entitled to reinstatement due to her wrongful termination.  As we discussed, Riggs's termination— for failing to test—was justified.  Accordingly, under *Barber*, she was entitled only to back pay, not to reinstatement. (*Barber*, *supra*, 18 Cal.3d at pp. 402–405 [concluding employee's termination was not wrongful, but employee was entitled to back pay from date of dismissal to date of final termination decision due to *Skelly* violation].)

## DISPOSITION

The judgment is affirmed.  Respondents are awarded their costs on appeal, if any.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

EDMON, P. J.

ADAMS, J.

31